# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JEANNETTE TOPPIN, *as Administrator* )
*of the Estate of DAQUAN MONICURE,*[1] )
                              )
           Plaintiff,        )
                              )
           v.                   )          1:20cv1
                              )
UNITED STATES OF AMERICA,       )
                              )
           Defendant.       )

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Jeannette Toppin (the "Plaintiff"), who represents the estate of her deceased son Daquan Monicure (the "Decedent"), brought this negligence action against the United States (the "Defendant") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671-2680. (<u>See</u> Docket Entry 1.) The Court (per the undersigned United States Magistrate Judge (<u>see</u> Docket Entry 15 (referring case to United States Magistrate Judge for all proceedings upon consent of parties))) held a bench trial on August 23, 2021, and now enters this Memorandum Opinion and

---

[1]      Jeannette Toppin originally brought this action "individually and as administrator of the estate of Daquan Monicure." (Docket Entry 1 at 1 (standard capitalization applied).) She later "agree[d] to dismiss [her] individual claim" (Docket Entry 60 at 6), and the Court (per the undersigned United States Magistrate Judge) issued an oral order to that effect (<u>see</u> Docket Entry 57 at 4-5).

Order setting forth its Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a)(1).[2]

<h2 style="text-align:center"><strong><u>BACKGROUND</u></strong></h2>

This case arises from an incident on September 6, 2017, in Lexington, North Carolina, during which a vehicle driven by Debra Midkiff Yarborough ("Yarborough"), then an employee of the United States Postal Service ("USPS"), collided with Decedent and his vehicle, resulting in Decedent's death. (<u>See</u> Docket Entry 1 (the "Complaint"), ¶¶ 7–8, 12–19.) Pursuant to 28 U.S.C. § 2675, Plaintiff presented a wrongful-death claim to the USPS on January 28, 2019, seeking to recover $5,000,000 in damages. (<u>See</u> Docket Entry 1, ¶ 9; Docket Entry 38-2 at 1–2.)[3] After the USPS denied

---

[2]  To the extent any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded. <u>See, e.g.</u>, <u>Utzinger v. United States</u>, 432 F.2d 485, 489 (6th Cir. 1970) (noting that "labels applied [to findings of fact and conclusions of law] are not controlling").

[3]  Under the FTCA's "presentment" requirement,

> [a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent act or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a); <u>see also</u> <u>Henderson v. United States</u>, 785 F.2d 121, 123 (4th Cir. 1986) ("[T]he requirement of filing an administrative claim is jurisdictional and may not be waived.").

-2-

that claim (see Docket Entry 1, ¶ 10), Plaintiff initiated the instant action. Defendant answered the Complaint, admitting Yarborough's status as a USPS employee at the time of the collision, denying other allegations (to include Plaintiff's entitlement to relief), and lodging various affirmative defenses. (See Docket Entry 10.)

The parties agreed to a pretrial schedule, consented to the exercise of jurisdiction by a United States Magistrate Judge, and acknowledged that the FTCA, pursuant to 28 U.S.C. § 2402, provided for a trial by the Court without a jury. (See Docket Entry 14.) The Court (per Chief United States District Judge Thomas D. Schroeder) thereafter referred the case "to [the undersigned] to conduct all proceedings including a . . . nonjury trial, to order the entry of judgment, and to conduct all post-judgment proceedings therein." (Docket Entry 15 at 1.)

The parties engaged in discovery, during which Plaintiff requested that Defendant admit, inter alia, that (i) Yarborough acted within the scope of her employment at the time of the collision and (ii) "Yarborough and the United States are fully responsible for the [collision resulting in Decedent's death]." (Docket Entry 60-3 at 1–3.) As to the first request, Defendant admitted that "Yarborough was performing duties" and "operating her vehicle in furtherance of the interests of the USPS on September 6, 2017." (Id. at 2.) Regarding the second request, Defendant

-3-

represented that it lacked an adequate opportunity to gather information to determine whether Decedent bore responsibility for or contributed to the collision. (See id. at 3.) After the close of discovery, Defendant declined to file a dispositive motion. (See Docket Entry 21 (withdrawing notice of intent to file dispositive motion).)

In the course of arranging for mediation and trial, the parties confronted an issue regarding the proper beneficiary of Decedent's estate. More specifically, during discovery, the parties had "operate[d] under the assumption that I.M., as [Decedent]'s only child, unquestionably constitute[d] the sole beneficiary of [Decedent]'s estate." (Docket Entry 24 at 2 (citing Minute Entry dated Mar. 18, 2021).) However, Decedent died without a will, and I.M. was born out of wedlock (see Minute Entry dated Mar. 18, 2021 (indicating that Decedent never married)), which circumstances affect I.M.'s ability to inherit under North Carolina's intestacy statutes, see N.C. Gen. Stat. §§ 29-18, 29-19. The parties addressed that topic during subsequent status conferences. (See Minute Entry dated Apr. 1, 2021; Minute Entry dated Apr. 30, 2021.) Plaintiff then obtained an order from the District Court Division of Davidson County, North Carolina, deeming I.M. "the biological and legitimate child of [D]ecedent" (Docket Entry 60-6 at 3 (citing N.C. Gen. Stat. § 49-10)). (See also

-4-

Docket Entry 26 (Joint Notice indicating that "[I.M.] is now legitimated").)

As the August 2021 trial approached, the parties stipulated as to the authenticity and admissibility of certain exhibits, including the "[b]ill for [Decedent]'s funeral" (the "Bill") (see Docket Entry 45 at 1). Defendant also filed two motions in limine (Docket Entries 32 (the "First Motion in Limine"), 37) and objections (Docket Entry 43) to Plaintiff's final pretrial disclosures (Docket Entries 36, 40). Via the First Motion in Limine, Defendant sought to exclude or limit evidence as to I.M.'s entitlement to damages, arguing that I.M. failed to qualify as a proper beneficiary of Decedent's estate because his parents never married and because Plaintiff had not complied with North Carolina law in attempting to legitimate I.M. as Decedent's child. (See Docket Entry 33 at 6–19; see also id. at 4–6 (observing that legitimation under N.C. Gen. Stat. § 49-10 must occur during putative father's lifetime).)

At the final pretrial conference, the Court overruled Defendant's objections to Plaintiff's final pretrial disclosures (see Docket Entry 57 at 7–16) and denied the First Motion in Limine without prejudice, recognizing its obligation to credit the state court order legitimating I.M. while expressing reservations about the correctness of that ruling (see id. at 29–53, 77–78). In addition, pursuant to Federal Rule of Civil Procedure 16(c), the

-5-

Court addressed Defendant's affirmative defenses, which included contributory negligence by Decedent and lack of proximate causation (see Docket Entry 10 at 5), as well as Defendant's responses to Plaintiff's request for admissions (Docket Entry 60-3). (See Docket Entry 57 at 17–20.) More specifically, the Court inquired whether any material factual dispute remained regarding Defendant's liability for Decedent's wrongful death. (See id. at 17–18 (noting that Plaintiff had not moved for summary judgment on liability but that Court could grant such relief sua sponte after notice to parties and reasonable time to respond).) In connection with a discussion on that topic (see id. at 20–28), Defendant supplemented its responses to Plaintiff's request for admissions (see Docket Entry 59 at 2–3 (admitting lack of contributory negligence by Decedent and proximate causation by Yarborough)), after which Plaintiff orally moved for summary judgment on liability (see Docket Entry 57 at 76). The Court thereafter deemed Defendant's liability established as a matter of law. (See id. at 75–77 (crediting Defendant's admissions as to scope of employment, proximate causation, and contributory negligence).)

The day before trial, Plaintiff (i) designated herself (instead of I.M.) as the sole beneficiary of Decedent's estate (see Docket Entry 50 at 1), narrowing the claim for damages to funeral expenses and Plaintiff's loss of Decedent's "society, companionship, comfort, guidance, kindly offices and advice" (id.),

-6-

(ii) identified herself as the sole trial witness (see Docket Entry 51 at 1), and (iii) listed four trial exhibits (see id. (including photographs of Decedent and I.M. (the "Photographs"), Decedent's funeral program (the "Program"), the Bill, and (unspecified) life expectancy tables)).  In connection with those changes, Plaintiff withdrew her objection to the First Motion in Limine and conceded that I.M. had not been properly legitimated under North Carolina law.  (See Docket Entry 55 at 3 (reciting email from counsel for Plaintiff on foregoing topics).)

On the morning of trial, Defendant objected to the Photographs and Program.  (See id. at 5-9 (lodging objections under Federal Rules of Evidence 402 ("Rule 402") and 403 ("Rule 403"), as well as Federal Rule of Civil Procedure 26(a)(3)(A)(iii) ("Rule 26(a)(3)(A)(iii)")).)  Defendant further challenged the use of life expectancy tables, arguing that Plaintiff had failed to timely disclose any such tables in violation of Rule 26(a)(3)(A)(iii). (See id. at 9-10.)[4]  Moreover, Defendant objected to Plaintiff's assertion of a claim for damages as the beneficiary of Decedent's estate, contending that such claim violated the FTCA's presentment requirement.  (See id. at 10-12 (Defendant arguing that Plaintiff never presented such claim to USPS prior to filing suit).)

---

[4]  Plaintiff later clarified that she intended to use the mortality tables referenced in "the pattern jury instructions on wrongful death damages" (id. at 13).

As concerns Defendant's trial-related objections, the Court (i) overruled the objections based on Rules 402 and 403 without prejudice to Defendant's ability to raise them during the presentation of evidence (see id. at 18), (ii) rejected Rule 26(a)(3)(A)(iii) as a basis for excluding the Program (see id. at 18-19), and (iii) discerned no unfair surprise in taking judicial notice of life expectancy tables (see id. at 19). Regarding whether Plaintiff had violated the FTCA's presentment requirement by identifying herself as the beneficiary of Decedent's estate, the Court declined to rule on that issue without affording the parties an opportunity to submit post-trial briefing and/or motions. (See id. at 17-18.)

A one-day bench trial followed, at which Plaintiff testified as the sole witness and during which Plaintiff offered as exhibits the Photographs, Program, and Bill. (See Docket Entry 52 (Exhibit and Witness List).) Plaintiff also asked the Court to take judicial notice of the "Life table for non-Hispanic black females: United States, 2018" from the National Vital Statistics Reports issued by the United States Department of Health and Human Services (the "Life Table"). (See Docket Entry 55 at 54-55 (identifying 37.5 years as life expectancy for 43-year-old non-Hispanic black female).) Defendant renewed its objections to the Photographs and Program (see id. at 28-30, 33-34) and challenged the Life Table on authenticity and hearsay grounds (see id. at 55-57). Defendant

-8-

also reasserted its "pretrial objection regarding the new damages claim" in which Plaintiff had purported to replace I.M. as the sole beneficiary of Decedent's estate.  (See id. at 59.)  Defendant declined to present any evidence.  (See id. at 60.)

The Court ultimately admitted the Photographs and Program, overruling Defendant's Rule 402 and Rule 403 objections, and admitted the Bill as stipulated by the parties.  (See id. at 55.) As to the Life Table, the Court held open Defendant's objections, directing the parties to consult as to authenticity and file a notice setting out their respective positions.  (See id. at 57-59.) Finally, the Court again deferred ruling on the presentment issue and set deadlines for the parties to submit post-trial filings. (See id. at 59-60.)

At the conclusion of closing arguments (see id. at 60-69), the Court took the case under advisement and directed the parties to file proposed findings of fact and conclusions of law (see id. at 69-71).  Following the trial, Defendant tendered a notice indicating "its withdrawal of the oral motion to dismiss" based on Plaintiff's supposed failure to satisfy the FTCA's presentment requirement.  (See Docket Entry 54 at 1.)  The parties also submitted a joint notice stipulating as to the authenticity of the Life Table (see Docket Entry 53 at 1), with Defendant "maintain[ing] all other objections made at trial to the admissibility of th[at] document" (id.).

-9-

As directed, Plaintiff and Defendant each offered proposed findings of fact and conclusions of law. (See Docket Entries 56, 58.) Plaintiff has requested that the Court award $7,829.50 in funeral expenses (Docket Entry 56, ¶ 37) and "$1,368,750.00 as fair and reasonable compensation for the loss of society, companionship, comfort, guidance, kindly offices and advice of [ Decedent], to his mother and sole heir, [Plaintiff]" (id., ¶ 39), for a total award of $1,376,579.50 (id., ¶ 40). As Plaintiff explained in her closing argument (see Docket Entry 55 at 65), her assessment of non-economic damages represents $100 per day for 37.5 years.

For its part, Defendant has challenged Plaintiff's approach as "arbitrary" (Docket Entry 58, ¶ 51) and instead has proposed compensating Plaintiff at the rate of $25 per day for 182.5 days per year for 30 years (see id., ¶¶ 52-54 (suggesting 30 years as "reasonable estimate of Plaintiff's life expectancy" and noting frequency of communication between Plaintiff and Decedent)). Defendant has urged the Court not to take judicial notice of the Life Table, insisting that Plaintiff's life expectancy remains "subject to reasonable dispute . . . based on the evidence at trial" (id., ¶ 42; see also id. ¶¶ 39-41 (summarizing some details elicited on cross-examination about Plaintiff's medical conditions)). In Defendant's view, the Court should award $136,875.00 in non-economic damages, together with $7,829.50 in funeral expenses, for a total of $144,704.50. (See id., ¶ 55.)

-10-

**DISCUSSION**

**I. Relevant Legal Standards**

**A. Federal Rule of Civil Procedure 52**

When litigants try an action before the court instead of a jury, "the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a).

**B. Federal Rule of Evidence 201**

The Court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  Additionally, "[t]he [C]ourt . . . may take judicial notice on its own" and "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c).[5] "Th[e United States Court of Appeals for the Fourth Circuit] and numerous others routinely take judicial notice of information

_____

[5]   The Federal Rules of Evidence generally apply in federal court, even when courts apply state substantive law. See <u>Hottle v. Beech Aircraft Corp.</u>, 47 F.3d 106, 109 (4th Cir. 1995) (deeming Federal Rules of Evidence "validly enacted procedural rules" applicable in diversity cases).  However, even if North Carolina law applied on the issue of judicial notice, North Carolina Evidence Rule 201 closely mirrors its federal counterpart. <u>Compare</u> N.C. Evid. R. 201, <u>with</u> Fed. R. Evid. 201.

-11-

contained on state and federal government websites." <u>United States</u>
<u>v. Garcia</u>, 855 F.3d 615, 621 (4th Cir. 2017).  Courts have
determined that no reasonable dispute exists as to some information
in the National Vital Statistics Reports.  <u>See</u> <u>Johnson v. Mead</u>
<u>Johnson & Co.</u>, Civil No. 11-225, 2013 WL 716816, at *2 n.4 (D.
Minn. Feb. 27, 2013) (unpublished), <u>rev'd on other grounds</u>, 754
F.3d 557 (8th Cir. 2014).

## **C. FTCA and North Carolina Wrongful Death**

Under the FTCA,

district courts . . . have exclusive jurisdiction of
civil actions on claims against the United States, for
money damages . . . for . . . personal injury or death
caused by the negligent or wrongful act or omission of
any employee of the Government while acting within the
scope of his office or employment, under circumstances
where the United States, if a private person, would be
liable to the claimant in accordance with the law of the
place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

In turn, North Carolina authorizes an action for damages
brought by the personal representative of a decedent when the death
of the latter "[wa]s caused by a wrongful act, neglect or default
of another, such as would, if the injured person had lived, have
entitled the injured person to an action for damages therefor,"
N.C. Gen. Stat. § 28A-18-2.  The categories of recoverable damages
"for death by wrongful act include . . . reasonable funeral
expenses," N.C. Gen. Stat. § 28A-18-2(b)(3), as well as

[t]he present monetary value of the decedent to the
persons entitled to receive the damages recovered,

-12-

including but not limited to compensation for the loss of the reasonably expected;
a. Net income of the decedent,
b. Services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered, [and]
c. Society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered . . . .

N.C. Gen. Stat. § 28A-18-2(b)(4).[6]  That final subcategory of damages ("Loss of Society Damages") "permit[s] recovery for the 'sense of loss,' 'loneliness' and even 'grief' that the beneficiaries experience from the death of the decedent." Mark W. Morris & Charles E. Daye, 1 North Carolina Law of Torts § 24.30 (2021).

"The first step to determine the damages recoverable under [N.C. Gen. Stat. § 28A-18-2(b)(4)] is to identify the particular persons who are entitled to receive the damages recovered." Bowen v. Constructors Equip. Rental Co., 283 N.C. 395, 418, 196 S.E.2d 789, 805 (1973).  "[R]ecovery for wrongful death is to be distributed according to [North Carolina's] Intestate Succession Act . . . ." Bowling v. Combs, 60 N.C. App. 234, 237, 298 S.E.2d 754, 756 (1983) (citing N.C. Gen. Stat. §§ 29-1 through 29-30). Under North Carolina law, the property of a person who dies

---

[6]  Although North Carolina's wrongful-death statute allows recovery of punitive damages under certain circumstances, see N.C. Gen. Stat. § 28A-18-2(b)(5), the FTCA prohibits recovery of such damages, see 28 U.S.C. § 2674.  That prohibition controls in this action.  See Nagy v. FMC Butner, 376 F.3d 252, 254 (4th Cir. 2004).

-13-

intestate without a surviving spouse or child[7] passes to the decedent's surviving parents, in equal shares. See N.C. Gen. Stat. § 29-15(3).

### D. Loss of Society Damages

As a general matter, "the damages in any wrongful death action are to some extent uncertain and speculative. A [factfinder] may indulge in such speculation where it is necessary and there are sufficient facts to support speculation." Gay v. Thompson, 266 N.C. 394, 398, 146 S.E.2d 425, 428 (1966). "The fact that the full extent of the damages must be a matter of some speculation is no ground for refusing all damages." Brown v. Moore, 286 N.C. 664, 673, 213 S.E.2d 342, 349 (1975) (emphasis added). However, "damages may not be assessed on the basis of sheer speculation, devoid of factual substantiation." Gay, 266 N.C. at 398, 146 S.E.2d at 428; accord Brown, 286 N.C. at 673, 213 S.E.2d at 349 ("[T]he plaintiff must satisfy the [factfinder] by the greater weight of the evidence of the existence of damages and of facts which will furnish some basis for a reasonable assessment.").

"Damages recoverable under [N.C. Gen. Stat. § 28A-18-2(b)(4)] would be as capable of exact ascertainment as damages for pain and

---

[7] In this context, the term "child" refers to a child born during lawful wedlock as well as an adopted or legitimated child. See N.C. Gen. Stat. §§ 29-17, 29-18, 29-19; see also In re Estate of Williams, 246 N.C. App. 76, 77, 783 S.E.2d 253, 255 (2016) (deeming child born out of wedlock ineligible to inherit under North Carolina law and rejecting constitutional challenge to intestacy statute).

-14-

suffering and mental anguish in a personal injury action." Bowen, 283 N.C. at 419-20, 196 S.E.2d at 806. "The present monetary value of the decedent to the persons entitled to receive the damages recovered will usually defy any precise mathematical computation. Therefore, the assessment of damages must, to a large extent, be left to the good sense and fair judgment of the [factfinder] . . . ." Brown, 286 N.C. at 673, 213 S.E.2d at 348 (internal citation omitted). In calculating such intangible damages, the factfinder may entertain a "lump sum" valuation as well as "a per diem type formula," accounting for "the intensity and extent of the losses and their duration." Weeks v. Holsclaw, 306 N.C. 655, 661-62, 295 S.E.2d 596, 600-01 (1982); see also 9 Strong's North Carolina Index, Damages § 19 (4th ed. updated Aug. 2021) (describing "per diem argument[]" as "approach to the damage issue that [factfinder] may consider"); Braun v. Ahmed, 127 A.D.2d 418, 422-23, 515 N.Y.S.2d 473, 475-76 (N.Y. App. Div. 1987) (collecting cases).

Of particular note:

> [T]he loss of a son may be a grievous loss and
> substantially deprive the parents of services such as
> those described in [N.C. Gen. Stat.
> § 28A-18-2(b)(4)(iii)]. . . . Recovery for these items
> will vary from case to case according to the age of the
> deceased and the age of the person entitled to receive
> the damages recovered and their relationship with the
> deceased.

Bowen, 283 N.C. at 419-20, 196 S.E.2d at 805-06. As concerns the life expectancy issue, the factfinder must consider the

-15-

beneficiary's "health, constitution, and habits" and determine which person (the decedent or the beneficiary) possesses a greater life expectancy. Stutts v. Adair, 94 N.C. App. 227, 234, 380 S.E.2d 411, 415 (1989). When a beneficiary possesses a shorter life expectancy than the decedent, the damages award must reflect "the value of benefits that [beneficiary] might have expected to receive during his or her lifetime." Id. at 234, 380 S.E.2d at 416 (internal quotation marks omitted).

Regarding the nature of the relationship between the beneficiary and the deceased, the monetary value of Loss of Society Damages depends "on the degree of closeness, kinship, and the details of th[at] relationship," Morris & Daye, supra, § 24.30. Some relevant factors may include the frequency and duration of contact (including whether the beneficiary and decedent shared a household). See Fontenot v. Taser Int'l, Inc., No. 3:10CV125, 2012 WL 1379054, at *13 (W.D.N.C. Apr. 20, 2012) (unpublished) (mother describing happy memories with deceased son and feelings of pride at his high school graduation), aff'd in part and vacated in part, 736 F.3d 318 (4th Cir. 2013); Massengill v. Bailey, 254 N.C. App. 611, 802 S.E.2d 918 (table), 2017 WL 3027593, at *9 (N.C. Ct. App. July 18, 2017) (testimony describing mother and deceased son as "great friends" who lived together at time of son's death and shared daily meals); Thomas v. Hilburn, 654 So. 2d 898, 903 (Miss. 1995) (noting "almost constant contact [between son and deceased

-16-

father] through visits and telephone calls"); see also Wingfield v. State, 835 So. 2d 785, 808 (Miss. Ct. App. 2002) (deeming $500,000 award excessive when mother and deceased son had lived apart for several years and "had not enjoyed [] long-term, daily relationship").[8]

Moreover, in assessing the closeness of such relationship, courts have given weight to the number of members in a family unit. Thomas, 654 So. 2d at 903 (acknowledging beneficiary's status as only child); Motorola Commc'ns & Elecs., Inc. v. Wilkerson, 555 So. 2d 713, 724 (Miss. 1989) (same). Finally, courts may consider evidence of how a beneficiary reacted to the news of the decedent's passing and how the beneficiary has adjusted to life without that person. See Fontenot, 2012 WL 1379054, at *14 (mother testifying to falling down upon learning of son's death and struggling emotionally in subsequent years); Reiser v. Coburn, 255 Neb. 655, 663, 587 N.W.2d 336, 342 (1998) ("mother testif[ying] that she thought of [] loss of her son every day").

**E. Present Value**

Under North Carolina law, the Court must calculate the present value of any Loss of Society Damages. See N.C. Gen. Stat. § 28A-18-2(b)(4). In connection with that inquiry, a neighboring

---

[8]    The Court looks to other cases for guidance on these underlying issues but recognizes "that North Carolina [likely] would not adopt a comparative-verdict approach," Finch v. Covil Corp., 388 F. Supp. 3d 593, 630 (M.D.N.C. 2019).

court has accounted for inflation rates and "the United States Treasury's . . . thirty-year constant maturity rate" before arriving at a net discount rate for a present-value damages award. See Fontenot, 2012 WL 1379054, at *19; accord Kirchgessner v. United States, 958 F.2d 158, 161–62 (6th Cir. 1992) (interpreting Michigan law and explaining that net discount rate accounts for inflation and "real rate of return").

## II. Findings of Fact

### A. Parties

1) Plaintiff resides in Clayton, Johnston County, North Carolina and is the administrator of the estate of Decedent.

2) Defendant is the United States of America.

### B. Jurisdiction

1) The Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1).

### C. Venue

1) Venue lies in this District because the collision, "the act or omission complained of," 28 U.S.C. § 1402(b), occurred in Lexington, Davidson County, North Carolina. See 28 U.S.C. § 113(b) (providing that Middle District of North Carolina encompasses Davidson County).

-18-

**D. Governing Law**

1) North Carolina substantive law, as "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), applies in this action.

**E. Evidence of Reasonable Funeral Expenses**

1) Decedent's funeral expenses totaled $7,829.50.

**F. Evidence of Loss of Society Damages**

1) Decedent is survived by Plaintiff, his mother.

2) Plaintiff gave birth to Decedent when she was 20 years old and raised Decedent by herself, without any involvement by Decedent's father.

3) Decedent was a quiet child who performed well in school.

4) Decedent lived with Plaintiff until he turned 18 years old, after which point he dropped out of high school and moved in with his girlfriend and girlfriend's father in Lexington, North Carolina.

5) Plaintiff thereafter visited Decedent about once per month.

6) Plaintiff and Decedent communicated by telephone about every other day.

7) Decedent shared the news with Plaintiff when he learned that his girlfriend was pregnant with his child.

8) In 2013, when Decedent was 18 years old, his son I.M. was born.

9) Plaintiff met I.M. about a week after he was born.

-19-

10) Plaintiff felt pride watching Decedent become a father and noted that he seemed happy and more mature.

11) Decedent sent pictures of himself with I.M. to Plaintiff.

12) Plaintiff considered Decedent a good and loving father who took care of I.M.'s needs.

13) Plaintiff and her husband encouraged Decedent to enroll in Job Corps to obtain his high school diploma and vocational training so that he could provide for I.M.

14) In 2016, Decedent enrolled in Job Corps and moved to Pisgah Forest to complete the 10-month program.

15) Decedent graduated Job Corps with a high school diploma, driver's license, and certificate in carpentry.

16) Decedent thereafter secured employment at Lowe's Home Improvement in Brevard, North Carolina.

17) In 2017, Decedent moved to Thomasville, North Carolina, in order to be closer to Lexington, where I.M. lived.

18) Decedent obtained a job working at a trucking company in Lexington.

19) On September 6, 2017, Plaintiff received a call from the sheriff notifying her that Decedent had been killed in an accident (i.e., the collision involving Yarborough).

20) Plaintiff started crying, and her husband took over the phone.

21) Plaintiff's husband comforted her before notifying other family members.

22) Decedent's funeral took place ten days later in Fayetteville, North Carolina.

23) At Decedent's funeral, Plaintiff felt hurt but also numb.

24) It was difficult for Plaintiff to bury Decedent, and she took life one day at a time after his passing.

25) Plaintiff was accustomed to Decedent calling her or sending her text messages, and she misses him a lot.

26) Plaintiff visits Decedent's grave and changes the flowers on Decedent's gravestone at least three times per year.

27) Plaintiff was 43 years old at the time of Decedent's death.

28) Decedent was 22 years old at the time of his death and had a longer life expectancy than Plaintiff.

29) Plaintiff takes hydroxychloroquine for lupus, a diagnosis she received in 2010.

30) Plaintiff also takes medication, which she described as blood pressure pills, for headaches she experienced after a car accident in 2011, but does not have a history of high blood pressure.

31) Plaintiff suffered a stroke in November 2020, resulting in her hospitalization for two days and the discovery of a heart defect.

-21-

32) Plaintiff underwent an outpatient procedure in January 2021 to correct that defect.

33) Plaintiff denied using alcohol, tobacco or any illicit drugs.

34) The Court takes judicial notice of the fact that, in 2018, the average life expectancy for a 43-year-old non-Hispanic black female in the United States was 37.5 years.

35) The Court finds that, at the time of Decedent's death, Plaintiff reasonably could have expected to live another 37.5 years, based on her "health, constitution, and habits," Stutts, 94 N.C. App. at 234, 380 S.E.2d at 415, in that (i) the Life Tables represent the average life expectancy of individuals sharing some of Plaintiff's demographic traits, (ii) the record lacks evidence tending to show that headaches or lupus will reduce Plaintiff's life expectancy (especially given the varied kinds and severity of lupus),[9] (iii) Plaintiff's history of stroke does not support a reduction in life expectancy given that it stemmed from a now-resolved heart defect, and (iv) the fact that Plaintiff does not use alcohol, tobacco, or controlled substances likely renders her healthier than the average member of her cohort.

---

[9] The Court takes judicial notice of the fact that "[l]upus is an autoimmune disease" that includes "[s]ystemic lupus erythematosus[, which] can be mild or severe" as well as "[d]iscoid lupus" and "[s]ubacute cutaneous lupus," United States National Library of Medicine, MedlinePlus, Lupus, https://medlineplus.gov/lupus.html (last updated Sept. 15, 2021).

36) The Court finds that Plaintiff and Decedent enjoyed a very close relationship, in that (i) Plaintiff raised Decedent as a single parent, (ii) Plaintiff and Decedent lived together until Decedent turned 18, (iii) Plaintiff and Decedent thereafter continued to communicate frequently, exchanging telephone calls and text messages about every other day, (iv) Plaintiff visited Decedent on a regular basis, (v) Decedent shared important life events with Plaintiff, (vi) Plaintiff observed Decedent taking care of I.M. and received photographs of Decedent and I.M. spending time together, (vii) Plaintiff experienced grief and numbness upon learning of Decedent's death, (viii) Plaintiff regularly visits and tends to Decedent's grave, and (ix) Plaintiff greatly misses Decedent.[10]

37) Under the circumstances, the Court finds that $100 per day for 182.5 days per year for 37.5 years, for a total of $684,375.00, constitutes a reasonable assessment of Loss of Society Damages.[11]

38) Although both Plaintiff and Defendant acknowledged the need to calculate the present monetary value of Loss of Society Damages, neither suggested an appropriate discount rate. The Court finds that $684,375.00 represents present monetary value and

---

[10]    In so finding, the Court expressly credits Plaintiff's testimony as both highly credible and compelling.

[11]    This approach sets a reasonable value on the every-other-day communication with Decedent which Plaintiff previously enjoyed (and would have continued to enjoy) and uses that lost value as a reasonable proxy to assess Loss of Society Damages.

further finds that (i) the Congressional Budget Office predicts an average inflation rate of 2.1 percent per year beyond 2022[12] and (ii) the 30-year constant maturity treasury rate, during the first two weeks of October 2021, hovered around 2.1 percent.[13]

39) The Court finds that the amount of $7,829.50 constitutes reasonable funeral expenses.

## III. Conclusions of Law

1) Plaintiff proved by the greater weight of the evidence the existence of damages in the form of funeral expenses and Loss of Society Damages.

2) Plaintiff proved by the greater weight of the evidence facts that furnish some basis for a reasonable assessment of those damages.

3) Plaintiff is entitled to recover $7,829.50 for Decedent's funeral expenses.

4) Plaintiff is entitled to recover $684,375.00 as Loss of Society Damages.

---

[12]   See Committee for a Responsible Federal Budget, Analysis of CBO's July 2021 Budget and Economic Outlook (July 1, 2021), https://www.crfb.org/papers/analysis-cbos-july-2021-budget-and-economic-outlook (last visited Oct. 19, 2021).

[13]   See United States Department of the Treasury, Daily Treasury Yield Curve Rates, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/textview.aspx?data=yield (last visited Oct. 19, 2021).

-24-

5) Plaintiff is entitled to a judgment against Defendant in the amount of $692,204.50.

A Judgment will be entered accordingly.

                                    /s/ L. Patrick Auld
                                **L. Patrick Auld**
                        **United States Magistrate Judge**
October 20, 2021

-25-